**NOT FOR PUBLICATION**

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
_____
                                    :
FRED L. WATKINS,                    :
                                    :    Civil Action No.
            Plaintiff,              :    04-4967 (NLH)
                                    :
      v.                            :
                                    :
CAPE MAY COUNTY CORRECTIONAL        :    OPINION
CENTER, PRISON HEALTH SERVICES,    :
INC.,                               :
                                    :
            Defendants.             :
_____:
```

**APPEARANCES:**

FRED L. WATKINS, JR.
506346/334125B
NORTHERN STATE PRISON
P.O. BOX 2300
NEWARK, NJ 07114
*Pro Se*

STEPHEN E. SIEGRIST, ESQ.
MURPHY & O'CONNOR, LLP
COMMERCE CENTER, SUITE 130
1810 CHAPEL AVENUE WEST
CHERRY HILL, NJ 08002-4607
*Attorney for defendants Prison Health Services and County of Cape May, incorrectly named in the Complaint as Cape May County Correctional Center.*

**HILLMAN, District Judge**

### *I. Introduction*

Pro se plaintiff, Fred L. Watkins, Jr., filed a complaint pursuant to 42 U.S.C. § 1983 alleging that while he was a pretrial detainee at the Cape May County Correctional Center (hereinafter "County" or "Correctional Center"), from

approximately November 21, 2003, until November 16, 2004, the County and Prison Health Services, Inc. (hereinafter "PHS") were deliberately indifferent to his serious medical needs. Specifically, plaintiff states that the County and PHS refused to permit plaintiff to have magnetic resonance imaging (M.R.I.) to assist in diagnosing suspected nerve damage, and refused to fill his prescription for Bextra.  Defendants have moved for summary judgment, and for the reasons specified below, the Court grants defendants' motion.

## *II. Background*

It is undisputed by the parties that plaintiff's alleged nerve pain and numbness resulted from an injury that occurred before his incarceration at the Correctional Center.  During the fall of 2003, plaintiff experienced numbness and pain in his leg and arms and was in the process of securing Medicaid benefits in order to schedule an appointment with a neurologist.  Before he could schedule such an appointment, plaintiff was arrested and taken to the Correctional Center.  Shortly after his arrival, Watkins requested to be seen by the PHS doctor and requested an appointment with a neurologist.  The PHS doctor, Allan B. Martin, M.D., prescribed Neurotin, a medication for pain, and referred him to a neurologist. X-rays were taken on December 11, 2003, of Watkins' lumbar spine and on January 27, 2004, of his cervical spine.  On January 16, 2004, plaintiff was examined by a

neurologist who recommended that an M.R.I. be scheduled and wrote out prescriptions for three medications, Bextra, as needed for pain, Neurotin and Pamelor.  He also provided a sample supply of Bextra.  There is no indication on the prescription or other correspondence from the neurologist indicating that Watkins must receive Bextra, or specifying that another pain medication could not be substituted.  There is also no communication in the record from the neurologist that the M.R.I. must be performed on Watkins for treatment of his condition.

    Watkins received two of the medications, Neurotin and Pamelor.  He also received the sample supply of Bextra on an as needed basis for approximately one month.  The M.R.I. was not scheduled and, after the sample was depleted, the Bextra prescription was not filled.  In his Complaint and Opposition to Defendants's Motion for Summary Judgment, Watkins states that a nurse at the Correctional Facility, Tina Hansen, told him that the PHS doctor would not order the M.R.I. because it would cost the county too much money.  Watkins repeated this information in his deposition and also testified that Nurse Hansen stated she would talk to the doctor and the doctor would make a decision regarding the M.R.I.

    After the appointment with the neurologist, Watkins states that he continued to experience and complain of pain and numbness in his arms and legs.  In March 2004, Watkins was taken to the

3

hospital due to injuries he suffered from a physical altercation with an inmate at the Correctional Center.  On April 16, 2004, Watkins complained of pain in his shoulder and his Neurotin was increased.  Watkins was examined by the PHS doctor on July 1, 2004 and again on July 19, 2004, for stiffness in his right shoulder.  Watkins was examined by an orthopedic doctor on July 7, 2004 and on September 8, 2004.  X-rays were taken of his shoulder and the doctor prescribed physical therapy exercises for Watkins to perform. The orthopedic doctor also gave Watkins a Cortizone shot in his shoulder.  Watkins' shoulder problems subsequently resolved. On October 18, 2004, Watkins was seen by a doctor for heartburn and was given Zantac.[1]  Watkins testified in deposition that while at the Correctional Center, he worked at the prison wiping off tables and setting up chairs for breakfast.

Defendants have submitted a certification from Allan B. Martin, M.D. stating that the decision not to order the M.R.I. or fill the prescription for Bextra for Watkins was because in Dr. Martin's opinion it was not medically necessary to do so. Richard Harron, Warden of the Correctional Center, submitted a certification stating that decisions regarding the type of

---

[1] Watkins was given a variety of medication while at the Correctional Center.  Those medications are not listed in this Opinion due to an Order entered on December 13, 2005, by the Honorable Freda L. Wolfson, United States District Judge for the District of New Jersey, sealing documents consisting of plaintiff's medical records.

medical care that an inmate receives at the Correctional Center are made by the medical staff of PHS.

## II.   *Standard for Summary Judgment*

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating

the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

### *III. Discussion*

Plaintiff maintains that during the relevant time, he was a pretrial detainee and, therefore, entitled to Due Process protections under the Fourteenth Amendment. Defendants have not challenged this assertion.[2] For claims brought by pretrial

---

[2] The constitutional standards governing conditions of confinement are different for pretrial detainees than for sentenced inmates. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 n. 31 (3d Cir. 1987). For pretrial detainees, the standard is "whether the conditions amount to "punishment" without due process of the law, in violation of the fourteenth amendment." Id., relying on Bell v. Wolfish, 441 U.S. 520, 535 (1979). For sentenced inmates, the standard is whether the conditions of confinement subject prisoners to unnecessary and wanton infliction of pain in violation of the Eighth Amendment's proscriptions against cruel and unusual punishment. Id. Thus, for pretrial detainees, the Eighth Amendment is relevant to the extent that it establishes a

detainees under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment for deliberate indifference to medical needs, the standard promulgated under Estelle v. Gamble, 429 U.S. 97 (1976) for the provision of medical care to convicted inmates is applied to pretrial detainees. Natale v. Camden County Correctional Facility, 318 F.3d 575, 581-82 (3d Cir. 2003). For allegations against an agency, here the Correctional Center and PHS, for deliberate indifference to medical needs, plaintiff must be able to provide evidence that a relevant policy or custom existed, and that the policy or custom caused the violation of his Fourteenth Amendment rights. Id. We first address plaintiff's allegations of deliberate indifference to his medical needs and then turn to the policy or custom requirement.

### A. Deliberate Indifference to Serious Medical Needs

Under Estelle and its progeny, plaintiff is required to meet a two-pronged test: (1) deliberate indifference on the part of the prison officials; and (2) that the prisoner's medical needs be serious. E.g., Wilson v. Seiter, 501 U.S. 294, 298-99 (1991). Defendants have not raised the argument that Watkins' medical needs were not serious. Taking all inferences in favor of the plaintiff as required on a motion for summary judgment, we find

---

floor so that the due process rights of a pretrial detainee are at least as great as the Eighth Amendment protections available to a convicted prisoner. Hubbard v. Taylor, 399 F.3d 150, 165-66 (3d Cir. 2005).

that Watkins has provided enough evidence for a jury to find that the pain and numbness he experienced in his arms and leg due to suspected nerve damage was a serious medical condition.

Therefore, our inquiry turns to whether the County and PHS were deliberately indifferent to Watkins' medical condition. Deliberate indifference is found where a plaintiff "had a serious need for medical care and prison officials ignored the evidence." Natale, 318 F.3d at 582.  It is also found where "necessary medical treatment is delayed for non-medical reasons." Id.; Monmouth, 834 F.2d at 347.  However, "... a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S. at 106.  "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." Monmouth, 834 F.2d at 346.

A review of the record shows that in December 2003, less than a month after his arrival at the Correctional Center, Watkins was seen by the PHS doctor and given medication for pain. X-rays were taken of his lumbar and cervical spine.  In January 2004, Watkins was referred to a neurologist who continued Watkins on his pain medication, and provided approximately a thirty day supply of Bextra.  In March 2004, Watkins was involved in an altercation with another inmate and received medical treatment

for his injuries. In July 2004, Watkins complained of pain in his shoulder. He was examined by the PHS doctor and referred to an orthopedist. He received x-rays of his shoulder and was given a shot of Cortizone as well as instructions for physical therapy on his shoulder that he could perform individually while in prison. Also, Watkins was treated with Zantac after seeing a doctor for complaints of heartburn. While receiving treatment for his medical problems, Watkins was able to work at the Correctional Center clearing tables and stacking chairs.

It appears that Watkins' complaint centers on his disagreement with the doctor over whether more tests should have been done, and more or different medication prescribed. Mere disagreement as to the proper treatment does not rise to the level of deliberate indifference to a serious medical need. As the Supreme Court stated in Estelle, "[a] medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment." Id. at 107. Watkins had several X-rays taken of his back and shoulder while he was at the Correctional Center. There is no evidence in the record that it was necessary for Watkins to have the M.R.I. to treat his medical condition, or that failure to perform the M.R.I. on Watkins would make his condition worse. See generally White v. Napoleon, 89 F.2d 103, 109-10 (3d Cir. 1990) (acknowledging that a doctor's disagreement with another doctor's judgment does not state a violation of the

9

Eighth Amendment, but repeated refusals to administer prescribed medication proved to be the only effective treatment may state a cause of action). Defendants have provided a certification by Dr. Martin, who treated Watkins, who states that in his medical opinion the M.R.I. was not medically necessary. The decision not to order an additional diagnostic test, here an M.R.I., does not amount to deliberate and arbitrary refusal to provide treatment.

Likewise, Watkins does not allege that his neurologist ordered that he take Bextra or his treatment would fail, or that only Bextra was effective in alleviating pain. See White, 897 F.2d at 110 (recognizing that doctor's decision to substitute medications is not actionable, but evidence that prison doctor repeatedly refused to provide proven effective medication after prior doctor ordered it exclusively, or indicated that treatment would fail without it, could state cause of action). The record does not show that Watkins' pain or numbness subsided while taking Bextra. Moreover, Watkins was already receiving Neurotin to alleviate pain. Defendants maintain that the Bextra prescription was not filled because in the PHS doctor's opinion it was medically unnecessary. The decision not to fill the prescription for Bextra does not rise to the level of deliberate and arbitrary refusal to provide treatment. Thus, Watkins' disagreement with the County and PHS over the type of treatment he should have received does not amount to deliberate

10

indifference of a serious medical condition.

### B. Policy or Custom

In order for the County or PHS to be liable, Watkins must be able to provide evidence that a relevant PHS or County policy or custom existed, and that the policy or custom caused the constitutional violation he alleges. Natale v. Camden County Correctional Facility, 318 F.3d 575, 583 (3d Cir. 2003) (finding that a reasonable jury could conclude that PHS's policy of permitting the first 72 hours of incarceration to pass before an inmate was to be seen by a doctor to rise to deliberate indifference to plaintiff's medical needs where plaintiff was diabetic and needed frequent insulin shots). Although neither PHS nor the County can be "held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability" there are situations "where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983." Natale, 318 F.3d at 583-84, relying on Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 691 (1978).

In Natale, the court outlined three such situations. Id. at 584 n.10, relying on Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 417 (1997) (Souter, J.

dissenting).³ The first situation is "where 'the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.'" Id. The second situation "occurs where 'no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.'" Id. The final situation exists "where 'the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Id. (citations omitted).

Watkins has not provided evidence from which a reasonable jury could conclude that the County or PHS had a policy or custom of refusing to schedule recommended tests, or policy or custom of refusing to fill needed prescriptions for the inmates. Similarly, Watkins has not presented evidence of a situation where the acts of a government employee could be deemed to be the result of a policy or custom: (1) he has not provided any evidence of a policy or custom by the County or PHS of refusing

---

³ The Third Circuit made clear that it cited to Justice Souter's dissenting opinion for the summary of the three situations, and not for its conclusion about the requisite evidentiary showing in those situations.

12

to order tests or fill prescriptions to subject prisoners to unnecessary and wanton infliction of pain or to punish pretrial detainees; (2) he has not articulated any federal rule that has been violated; and (3) he has failed to show how the refusal to continue a medication, when other medication was provided, or the refusal to schedule a M.R.I., when x-rays were taken, are inactions "so obvious" to policymakers as likely to result in the violation of constitutional rights.

In support of their motion for summary judgment, defendants provided a signed certification of Allan B. Martin, M.D. in which he states that he treated Watkins and, in his medical opinion, the Bextra medication and the M.R.I. were not medically necessary for Watkins' medical condition. Further, the Warden's certification states that decisions regarding medical care of the inmates are made by PHS staff. There is nothing in the record to suggest that decisions regarding Watkins' medical care were not made by the PHS staff.[4] Accordingly, taking all inferences in

---

[4] Watkins testified in deposition that a nurse at the Correctional Center, Tina Hansen, told him that the doctor would not order the MRI because it was too expensive. In response, defendants have submitted affidavits that the MRI was not ordered because, in the treating physician's medical opinion, it was not medically necessary. As set forth above, the standard for summary judgment requires that a party opposing summary judgment must do more than rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). Here, Watkins has not come forward with testimony or an affidavit of Nurse Hansen in opposition to defendants' motion. Watkins has offered only inadmissible hearsay. Mays v. H.G. Rhodes, 255 F.3d 644, (8th Cir. 2001)(finding plaintiff only

favor of Watkins, it cannot be said that reasonable minds could differ over whether a relevant policy or custom existed that resulted in deliberate indifference to Watkins' serious medical needs in violation of his Fourteenth Amendment rights.

### *IV. Conclusion*

For the foregoing reasons, defendants' motion for summary judgment is granted.  An appropriate Order will be entered following this Opinion.

|  |  |
|---|---|
| Camden, New Jersey | /s/ Noel L. Hillman<br>NOEL L. HILLMAN, U.S.D.J. |

Dated: October 3, 2006

---

provided unsworn accounts which are inadmissible hearsay).  Even liberally construing Watkins' submissions as a *pro se* litigant, the same standards for summary judgment apply. <u>Agogbua v. Abington Memorial Hospital</u>, No. 03-6897, 2005 WL 1353612, *3 (E.D. Pa. May 31, 2005)(Slip Copy).  Moreover, in his deposition, Watkins contradicted the statement he alleges was made by Nurse Hansen.  Watkins testified that in response to Nurse Hansen's telling him the doctor would not order the tests because they cost too much money, Watkins remarked, "you have to treat me" to which Nurse Hansen responded, "well, I'll tell the doctor and then whatever he decides."  Even if the testimony was not inadmissible hearsay, Watkins recitation of his conversation with Nurse Hansen suggests that it was the doctor's decision whether to order the tests, and not a policy or custom of the County.

14